550 So.2d 316 (1989)
PALERMO LAND CO., INC. & Browning-Ferris, Inc., Plaintiffs-Appellants,
v.
PLANNING COMMISSION OF CALCASIEU PARISH & Police Jury of Calcasieu Parish, Defendants-Appellees.
No. 89-359.
Court of Appeal of Louisiana, Third Circuit.
October 4, 1989.
Writ Granted December 8, 1989.
*317 J.A. Delafield, Carmouche & Grey, R. Williams Collings, Lake Charles, and Glen A. James, Sulphur, for plaintiffs-appellants.
Terry Manuel, Asst. Dist. Atty., Lake Charles, for defendants-appellees.
Before DOMENGEAUX, FORET and KING, JJ.
FORET, Judge.
This lawsuit arose as a result of the rezoning of certain properties in Calcasieu Parish in February of 1988. The properties at issue are owned by plaintiff, Palermo Land Company, Inc. (Palermo), and the Nelson[1] plaintiffs and were rezoned from an I-2, heavy industrial, classification to an I-1, light industrial, classification.
Browning-Ferris, Inc. (BFI), an additional plaintiff herein, holds an option to purchase the Palermo tract and had, in fact, purchased certain portions of the Palermo property at the time of trial.
As a result of the down-zoning, BFI and Palermo sued the Police Jury and Planning Commission of Calcasieu Parish (Parish). Shortly thereafter, the Nelson plaintiffs filed suit against these same defendants. Subsequently, these suits were consolidated, and a separate opinion is being rendered this date in Nelson v. Planning Commission of Calcasieu Parish, 550 So.2d 328 (La.App. 3 Cir.1989).
After trial, the district court, in written reasons for judgment, found that the actions of the Police Jury were not arbitrary and capricious and that the rezoning of the plaintiffs' property was valid. This appeal followed. We reverse the judgment of the trial court insofar as we find that the Parish failed to prove that the rezoning was due to a mistake in the original zoning or that the character of the neighborhood had changed to such an extent that reclassification was necessary.

FACTS
BFI has a sanitary landfill in Calcasieu Parish which is nearing maximum capacity. The Nelson property bounds the BFI landfill on the east while the Palermo property bounds the BFI landfill on the west. The Palermo parcel was originally zoned I-1, light industrial, in October of 1980. This zoning was increased to heavy industrial, I-2, in 1985.
The Nelson property was originally zoned in 1980, partially as C-3, central business, and the remainder as I-2, heavy industrial. In 1981, R.L. Nelson requested a rezoning of the C-3 portion to I-2 which was granted.
In the rezoning at issue, two other contiguous properties originally zoned I-2, heavy industrial, in 1980 were down-zoned to I-1, light industrial. These property owners are not parties to this lawsuit.
Both Palermo and Nelson had negotiated with BFI to sell their property to BFI for BFI's expansion purposes. BFI entered into an agreement with Palermo in December of 1985, wherein Palermo agreed to sell and BFI agreed to purchase the Palermo tract for the proposed new BFI sanitary landfill. This agreement arose after the July, 1985 rezoning of the Palermo tract to an I-2 classification. The I-2 classification, at that time, allowed for the location of a solid waste sanitary landfill.
Between the rezoning of the Palermo tract to I-2 in July of 1985 and the subsequent rezoning of the Palermo tract back to I-1 in February of 1988, BFI expended approximately $580,000 in preparation for the new sanitary landfill. Pursuant to a reclassification study, the Police Jury of Calcasieu Parish rezoned plaintiffs' property from I-2 to I-1 on February 18, 1988. This classification does not allow for the location of a solid waste sanitary landfill.
Subsequent to the commencement of this lawsuit, in July of 1988, the Police Jury enacted an ordinance creating an I-2R classification (heavy industrial restricted). Presently, this is the only classification in *318 Calcasieu Parish which allows for the placement of a sanitary landfill.

ASSIGNMENTS OF ERROR
Plaintiffs assign the following as assignments of error:
(1) The trial court erred in failing to apply the doctrine of equitable estoppel to the facts and circumstances surrounding the rezoning of the Palermo tract.
(2) The trial court erred in failing to find that the Parish acted arbitrarily and capriciously in rezoning the disputed area from a heavy industrial to light industrial classification.[2]
Was the Police Jury estopped from down-zoning the Palermo property after Palermo and BFI had changed their position to their detriment in reliance upon the existing zoning and upon actions of certain police jurors and planning commission members?
Further, did the down-zoning of the property in dispute, by the Police Jury, amount to an arbitrary and capricious abuse of discretion and an excessive use of power?

RECLASSIFICATION
BFI filed a Site Suitability Study for its proposed landfill expansion with the Louisiana Department of Environmental Quality (DEQ) in late 1987. In response to this study, DEQ sent a copy to the Calcasieu Parish Police Jury requesting comments and public review. Additionally, on December 9, 1987, DEQ published notice of a public comments hearing regarding the proposed landfill expansion which was set for December 29, 1987.
The following facts are stipulated between the parties, in pertinent part:
"On December 29, 1987, the Police Jury Ways and Means Committee met and discussed rezoning of the disputed tract.....
At that meeting, the Committee approved a report recommending that the Planning Department undertake a reclassification study to determine whether the Police Jury should rezone the disputed tract from I-2 to I-1.....
Although approval of the full Police Jury was necessary before the Planning Commission could begin the reclassification study, the Planning Department immediately posted signs on the disputed tract and published advertisements notifying the public that a reclassification study was imminent....
The Police Jury met on January 7, 1988 and declined to adopt the Ways and Means Committee Report.....
On January 19, 1988, the Planning Commission adopted a resolution directing the Calcasieu Parish Planning Department to conduct a zoning reclassification study as follows:
all property currently zoned "I-2" to appropriate lower classifications in the area of Calcasieu Parish bounded on the north by Interstate Highway 10, on the south by Bayou d'Inde, on the east by Louisiana Highway 108, and on the west by Post Oak Road."
Meanwhile, BFI's permit application for the proposed landfill expansion was received by DEQ on January 20, 1988.
".... [T]he Planning Department prepared a Reclassification Study (the `Study'), which it presented to the Planning Commission on February 17, 1988. ....
The Planning Department formally presented the Study to the Planning Commission on February 17, 1988. Acting upon the Planning Department's recommendations contained in the Study, the Planning Commission resolved to recommend to the Police Jury reclassification of the disputed tract from I-2 to I-1.....
The next day, on February 18, 1988, the Police Jury voted to reclassify the disputed tract from I-2 Heavy Industrial to I-1 Light Industrial."
On March 11, 1988, BFI received a letter from DEQ stating that the initial review of the permit application was substantially *319 complete. DEQ informed BFI that they would not proceed any further with this review insofar as the proposed landfill site was no longer zoned appropriately for a landfill.

EQUITABLE ESTOPPEL
The minutes of various Planning Commission and Police Jury meetings clearly reveal that the Parish was well aware of the possibility that the Palermo tract could be used as a landfill. It was stipulated at trial that as early as July 18, 1985, when the Palermo tract was zoned from I-1 to I-2, that a motion was proposed which would have prohibited use of the Palermo tract as a sanitary landfill. This motion failed because the Nelsons, who owned the property adjoining the existing landfill on the east, opposed placing a similar restriction on their property. Nevertheless, the Palermo tract was granted I-2 zoning at this July, 1985 Police Jury meeting; zoning appropriate for sanitary landfill.
On July 25, 1985, after the Palermo tract was up-zoned to heavy industrial, the Ways and Means Committee met and recommended the adoption of an ordinance regulating sanitary landfills in Calcasieu Parish. Ordinance No. 2739, proffered at trial by appellants, was adopted to regulate the issuance of development permits for sanitary landfills. Under this ordinance, an applicant would apply for a development permit, which would only be approved after public hearing and after the applicant received all of the required state and federal permits.
The transcript of the July 25, 1985 Police Jury Ways and Means Committee meeting, entered into evidence at trial, reflects that Jim Vickers, Parish Planner, was aware that the role of the Police Jury in approving a sanitary landfill, under the new ordinance, would be minimal. He states, as follows:
"MR. VICKERS: Well, let me say one thing, Mr. Vaughn. I don't want to create a false impression. If you think that this ordinance is going to be a discretionary matter, once they've obtained the state permits, it's not going to be discretionary. What you're setting forth in this ordinance is that they're going to have to have all their state permits and they're going to have to provide you certified copies of them, and that you will have a public hearing on it, much like you do the liquor. But I don't see it as a discretionary thing. Because, let me tell you, once they meet the state and federal guidelines insofar as landfills, then then if you come back and say after they've spent all this money and met all these federaland then reject the site, then I think it's going to be arbitrary and capricious.
. . . . .
MR. VICKERS: It gives you a public hearing, but probably nothing more than that."
Palermo testified at trial that he understood, after a discussion with his police juror, John Vaughn, in approximately November of 1985, that because his property was zoned I-2 prior to the adoption of Ordinance 2739, that a development permit would not be necessary prior to the establishment of a landfill on his property.
His testimony is buttressed by the transcript of the relevant Ways and Means Committee meeting of July 25, 1985, which states, in pertinent part:
"CHAIRMAN VAUGHN: Okay. Let's see.
Jimmy, I have a question. On this particular ordinance that Mr. Schooler has, now previously people in I-2, they're grandfathered in, right?
MR. VICKERS: That's correct.
CHAIRMAN VAUGHN: Okay. You can't go back and change what they already got?
MR. VICKERS: Right."
Palermo continued his testimony by stating that Vaughn, his police juror, assured him that BFI was free to go about the business of preparing for the landfill.
Vaughn did not dispute this testimony. He did testify that he first heard of BFI's plans to expand the landfill in "the latter part of '85 or '86." Palermo testified that he and Vaughn continually discussed the *320 progress of the landfill expansion until December of 1987.
Palermo further testified that he and Vickers, Parish Planner, discussed the BFI proposed landfill expansion on several occasions.
In reliance upon the recently acquired heavy industrial zoning classification and the above assurances from the Parish, BFI and Palermo entered into a purchase agreement in December of 1985. At this time, BFI began preparations and site suitability studies for the new landfill.
Additionally, it was stipulated at trial that:
"On October 16, 1986 Police Jury President James Schooler, and Police Jury Members John Vaughn and Charles LeBouef each addressed identical letters to Mike Derdeyn at BFI, which letters Derdeyn actually received."
Insofar as we feel that this letter from three police jurors, including the president of the Police Jury, on Police Jury stationery, forms a significant basis for appellants' estoppel claims, we quote in extenso:
*321 
*322 Numerous additional acts were taken on behalf of Parish officials, acknowledging the Parish's awareness of BFI's plans for the new landfill, and upon which BFI and Palermo justifiably relied in continuing their efforts to prepare the landfill for construction.
For example, on January 5, 1987, Al Prater, Superintendent of Solid Waste for the Calcasieu Parish Police Jury, directed a letter to BFI requesting BFI to send a copy of the proposed landfill expansion site plan. The letter is on official Police Jury stationery and states that several police jurors had inquired about the location of the proposed entrance and exit gates for the landfill expansion site.
Additionally, an article appeared in the Southwest Builder newspaper dated March 29, 1987, where Jim Vickers, Parish Planner, was interviewed regarding the proposed landfill expansion. The article discussed BFI's plans to double the size of the landfill site and discussed the fact that Vickers had spoken with BFI officials and was aware that BFI was in the process of preparing a permit application with DEQ.
The article quoted Vickers as saying that there would probably be some opposition to the expansion but that there was no place that would satisfy everyone. Vickers discussed the necessity of having a landfill for community needs.
Finally, on November 20, 1987, Pam Sturrock, Development Permit Coordinator of the Office of Parish Planning and Development, prepared a letter to the Palermo Land Company stating that the Palermo tract was currently zoned I-2 and that this zoning classification permitted a solid waste disposal site. The evidence is disputed as to whether Ms. Sturrock was aware that this letter was to be included with BFI's permit application to DEQ.
Our research discloses only one case in Louisiana jurisprudence wherein the theory of equitable estoppel is discussed within a zoning context[3]. In State ex rel. Re-Lu, Inc. v. City of Kenner, 284 So.2d 866 (La. App. 4 Cir.1973), the president of a construction company brought a mandamus action to compel the issuance of a building permit to authorize the construction of a multiunit-residential structure. The developer was informed, prior to purchase, that the City of Kenner was considering a new comprehensive zoning ordinance which would restrict the use of the particular property involved to commercial use, preventing residential development. The developer testified that he had relied upon information that if he obtained a preliminary permit before adoption of the new ordinance, construction would be allowed within one year of the permit.
Unfortunately for the developer, upon adoption of the new ordinance, the provision maintaining existing classifications for one year for those properties with preliminary permits, was deleted.
The Fourth Circuit, in finding that the developer was not justified in relying upon the information he had received, insofar as he had knowledge that the new ordinance was under consideration prior to purchase, discussed the doctrine of equitable estoppel at page 868 as follows:
"The doctrine of equitable estoppel can be applied to a municipality when the act relied upon was within its corporate powers. In American Bank & T. Co. v. Trinity Universal Ins. Co., [251 La. 445, 205 So.2d 35 (1967) ] the Supreme Court of Louisiana defined the type of estoppel here urged by relator as follows:
`Equitable estoppel may be defined as the effect of the voluntary conduct of a party whereby he is precluded from asserting rights against another who has justifiably relied upon such conduct and changed his position so that he will suffer injury if the former is allowed to repudiate the conduct. Founded upon good faith, the doctrine is designed to prevent injustice by barring a party, under special circumstances, from taking a *323 position contrary to his prior acts, admissions, representations, or silence.'
In American Bank the court emphasized the importance of the justifiability of the reliance placed by the injured party on the action of the person against whom the estoppel is urged. Unless the injured party was justified in his reliance on the actions of the other party, estoppel is of no legal consequence." (Footnotes omitted.)
We find that Kenner is distinguishable from the facts at hand insofar as numerous affirmative acts on behalf of the Parish encouraged Palermo and BFI to expend considerable sums toward the development of a sanitary landfill.
Other jurisdictions have adopted the theory of equitable estoppel under facts where considerable expenditures have been made in justifiable reliance upon the acts or omissions of the government. A few cases invoking this trend are discussed in 82 Am. Jur.2d Zoning and Planning § 22 (1976), as follows:
"There are cases in which a municipality has been held not to be entitled to enact amendments which will unnecessarily cause injury to one who has purchased property in reliance on the original regulations.60 Under some circumstances, rights tantamount to vested rights may arise by the application of the doctrine of estoppel against the local zoning authority. In this respect, it has been held that equitable estoppel may be invoked against a local government exercising its zoning power where a property owner (1) in good faith (2) upon some act or omission of the government (3) has made such a substantial change in position or has incurred such extensive obligations and expenses that it would be highly inequitable and unjust to destroy the right he acquired.61 Thus, it has been held that a town was estopped to change the zoning of a tract where the town had previously zoned the tract to a multiple-family classification, knowing that a developer would rely upon that classification and planned a high-rise development, with the purchase of land contingent on obtaining that classification, and where, when the developer learned that the town contemplated a change in zoning to a single-family classification, it had spent or was obligated to spend $310,000 for the land and over $69,000 in other direct development expenses.62 It was similarly held that a county was estopped from further changing the zoning of the property of landowners who had incurred extensive financial obligations and expenses in reliance upon the rezoning of their property, which was granted only after the landowners had negotiated, planned, and fulfilled county requirements in activities lasting over a years.63 And a property owner who acquired land in reliance upon a zoning ordinance which had been in effect for nearly 20 years, and who had expended considerable money in the drawing of plans and specifications for the development and the financing of his property, acquired protected vested rights in the property prior to the village board's attempted change of ordinance in order to rezone the area where there was no material change in the character of the neighborhood.64"[4]
*324 See also, Project Home, Inc. v. Town of Astatula, 373 So.2d 710 (Fla. 2d DCA 1979).
We find that plaintiffs' reliance was justified and that they will suffer considerable injury if the Parish is allowed to repudiate its conduct and down-zone the disputed property. Therefore, we hold that the Parish is estopped from changing the zoning of the Palermo tract from an I-2 to an I-1 classification.

ARBITRARY and CAPRICIOUS RECLASSIFICATION
We review the Parish's decision to rezone the properties at issue in light of the guidelines set forth by the Louisiana Supreme Court in Four States Realty Co., Inc. v. City of Baton Rouge, 309 So.2d 659, 672 (La.1975), as follows:
"The authority to enact zoning regulations flows from the police power of the various governmental bodies; zoning is a legislative function. State ex rel. Civello v. City of New Orleans, 154 La. 271, 97 So. 440 (1923); State ex rel. Dema Realty Co. v. McDonald, 168 La. 172, 121 So. 613 (1921); Meyers v. City of Baton Rouge, 185 So.2d 278 (La.App. 1st Cir.1966); Smith v. City of Baton Rouge, 233 So.2d 569 (La.App. 1st Cir. 1970). Courts will not and cannot substitute their wisdom for that of a legislative body or other zoning authority except when there is an abuse of discretion or an excessive use of power. However, the exercise of a police power in zoning cannot be made without substantial relation to the health, safety and general welfare of the public. City of Shreveport v. Conrad, 212 La. 737, 33 So.2d 503 (1947); City of Shreveport v. Bayse, 166 La. 689, 117 So. 775 (1928). All ordinances are presumed valid; whoever attacks the constitutionality of an ordinance bears the burden of proving his allegation. City of New Orleans v. Beck, 139 La. 595, 71 So. 883 (1916); Ward v. Leche, 189 La. 113, 179 So. 52 (1938). However, rezoning on a piecemeal or spot basis is highly suspect. Generally, property owners may rely upon the previous exercise of police power in zoning, expecting that changes in zoning will only be made so as to affect vested property interests when the change is required to assure the public welfare." (emphasis added)
Due to the highly suspect nature of "piecemeal" zoning reclassifications, discussed in Four States and apparent in this case, we adopt the specific jurisprudential guidelines set forth in Dufau v. Parish of Jefferson, 200 So.2d 335 (La.App. 4 Cir. 1967). Dufau involved a proceeding challenging the validity of a parish zoning ordinance which rezoned an area from commercial to residential. The properties at issue had been zoned commercial for six years and a large percentage of the properties involved were, in fact, being used for commercial purposes. The Fourth Circuit affirmed the trial court in finding that the ordinance was invalid as to plaintiffs' properties which were surrounded by commercial activity and would be valueless as residential property.
The Fourth Circuit stated as follows:
"1. A homeowner has the right to rely on the rule of law that a classification made by ordinance will not be changed unless the change is required for the public good.
2. The power to amend is not arbitrary. It cannot be exercised merely because certain individuals want it done or think it ought to be done.
3. Before a zoning board rezones property, there should be proof either that there was some mistake in the original zoning or that the character of the neighborhood has changed to such an extent that reclassification ought to be made.
4. The burden of proof of original mistake or the need for a substantial change is upon the proponents of the change." Id., at pages 337, 338; see also, Trustees under Will, etc. v. Town of Westlake, 357 So.2d 1299 (La.App. 3 Cir.1978), writ denied, 359 So.2d 205 (La. 1978).
The purpose of this close scrutiny, given to reclassifications, requiring the proponents *325 of the change to prove either an original mistake or need for a substantial change, is to avoid arbitrary and unreasonable reclassifications brought about as a reaction to an owner's proposed use of its property rather than an adverse attitude toward the prevailing zoning. See, Four States Realty Co., 309 So.2d 659, 670.
"[T]he theory of a change in the comprehensive zoning ordinance is that in an application of the principles and the ideals followed by the governing body in the adoption of the ordinance as a whole the particular property is now in the wrong classification either because of some mistake in the original zoning or because of changes in the neighborhood." Paternostro v. Parish of Jefferson, 289 So.2d 327, 333 (La.App. 4 Cir. 1973), writ refused 293 So.2d 183 (La. 1974).
We applied similar reasoning in Kirk v. Town of Westlake, 373 So.2d 601 (La.App. 3 Cir.1979), writ denied, 376 So.2d 1268 (La.1979), wherein we held that the proponent of a rezoning had the burden of showing that the current zoning was unreasonable, in addition to showing the merits of the requested zoning change. Westlake, at page 604.[5]
In Hunter's Grove v. Calcasieu Parish Police Jury, 422 So.2d 673 (La.App. 3 Cir. 1982), two homeowner's associations which had no vested property interest in the rezoned property contended that the zoning board must justify rezoning with proof of a mistake in the original zoning or proof that the character of the neighborhood had changed to such an extent that reclassification ought to be made.
In Hunter's Grove, we distinguished Dufau, supra, on its facts; the Hunter's Grove plaintiffs had no vested property interest in the property rezoned; the Dufau plaintiffs did. Nevertheless, we note that in Hunter's Grove, evidence was adduced as to the change in economic conditions which necessitated a reclassification allowing for a mobile home subdivision rather than solely standard single family dwellings (the only additional use permitted by the reclassification).
Additionally, in Hunter's Grove, the police jury offered evidence that there would be no detrimental effect on the value of property owned by those in opposition to the rezoning.
Finally, the owner of the disputed property in Hunter's Grove testified as to the change in the character of the neighborhood; i.e., due to the Hunter's Grove development, he had had to cease farming operations on his land because he could no longer use aerial spraying.
The importance of distinguishing the difference between the rights affected by a comprehensive zoning on the one hand and a reclassification on the other is succinctly set forth by the Washington Supreme Court in Fleming v. City of Tacoma, 81 Wash.2d 292, 502 P.2d 327 (1972), as follows:
"Generally, when a municipal legislative body enacts a comprehensive plan and zoning code it acts in a policy making capacity. But in amending a zoning code, or reclassifying land thereunder, the same body, in effect, makes an adjudication between the rights sought by the proponents and those claimed by the opponents of the zoning change. The parties whose interests are affected are readily identifiable. Although important questions of public policy may permeate a zoning amendment, the decision has a far greater impact on one group of citizens than on the public generally.
Another feature of zoning amendment decisions, which distinguishes them from other types of legislative action, is their *326 localized applicability. Other municipal ordinances which affect particular groups or individuals more than the public at large apply throughout an entire geographic area within the municipal jurisdiction, whereas ordinances that amend zoning codes or reclassify land thereunder apply only to the immediate area being rezoned."
Appellees do not contend, nor is there any evidence put forth, that there was a mistake made in the prior heavy industrial zoning classification. Additionally, appellees do not contend, nor is there any evidence, that there has been any change in the character of the neighborhood necessitating a change in zoning.
The record does reveal that the property at issue was down-zoned solely to stop the completion of the proposed landfill expansion onto the Palermo tract or onto any land adjoining the present landfill, due to public opposition. Several jurors testified that this was the only case in the history of Calcasieu Parish where land had been down-zoned due to a proposed use which was allowed within the existing classification. Also, testimony was presented that this was the first instance in which the Police Jury had commenced a down-zoning action on its own motion. The evidence clearly reflects that there had been no change in the neighborhood between 1985 and 1988 other than perhaps an increase in industrial use.
The Reclassification Study, allegedly relied on by the Police Jury in determining whether to rezone the disputed tract, outlined the land use and development trends in the study area; collected traffic count information for a 48-hour period; discussed an environmental study relating to heavy metal pollution in the Calcasieu River Estuary[6]; highlighted the topography and flood zones within the study area; and discussed the zoning history of the target properties. The study recommends down-zoning on several parcels but states no reason for said recommendation.
Plaintiffs' land use planning and zoning experts, Anthony Joseph Mumphrey, Jr. and Stephen Villavoso, found the Parish's reclassification study inadequate for lack of analysis. They additionally found that the down-zoning itself was improper. They explained that zoning measures are properly utilized to implement a land use plan rather than using zoning measures as an "after the fact" attempt at planning. They both agreed that the "change or mistake" rule was an essential element in justifying rezoning.
Additionally, Vickers, Parish Planner, testified that the only expertise relied upon in the Reclassification Study was that supplied by BFI, specifically, an appraisal report and a site suitability report. These authorities did not support the decision to reclassify.
Mr. Moses Abelman was called by appellants, BFI and Palermo, as an expert in real estate appraisals. He found that the existing landfill had had no significant impact or adverse effect on property values in the area. He opined that if property adjacent to the landfill could only be used for residential use, there would be some probability of property devaluation. But, he noted that the industrial land use had increased between 1985 and 1988 in this general area.
Mr. Norman Terry, appellants' expert appraiser, also concluded that the existence of the existing landfill had not had an adverse effect on property values. Defendants presented no contrary evidence regarding the potential devaluation of property due to the presence of the landfill.
The Parish presented testimony by Dr. Dennis Ehrhardt, an expert in land use planning. Dr. Ehrhardt testified that the landfill expansion would increase traffic throughout the neighboring subdivision. This testimony must be discounted, as to the impact of the proposed landfill on traffic, insofar as Dr. Ehrhardt was uncertain at trial as to where the proposed entrance or traffic routes to the landfill would be, *327 much less being privy to knowledge of its potential impact on traffic. Dr. Ehrhardt did concede, on cross-examination, that he had no reason to believe that the expansion would cause an increase in truck traffic.
Appellees allege that there will be an increase in traffic due to the expansion of the landfill. Insofar as the proposed landfill is not an expansion in the true sense of the word but instead, a replacement for the present landfill, which is nearing maximum capacity, we do not find that appellees have shown that there would, in fact, be any increase in traffic, necessitating a change in zoning.
Dr. Ehrhardt also testified that the rezoning of the study area was in accord with good land use planning. This opinion is of no relevance to the issue of whether there was a substantial change in the neighborhood prior to rezoning which would support a rational basis for rezoning. A more appropriate land use configuration after rezoning, i.e., a mistake in judgment as to the original zoning, does not, in and of itself, justify rezoning.
Further, Dr. Ehrhardt testified that the only land use of a landfill which has reached capacity is passive recreational use. He felt that the use of this land as a landfill would eventually remove the tract from commerce. He opined that this would be a waste of prime industrial or commercial property because the property borders on Interstate 10. Again, we fail to find that this factor, in and of itself, provides any basis for rezoning property properly zoned for a sanitary landfill. There is no showing that this factor was not present in 1981 and 1985, when the properties were zoned I-2.
The Parish also called Mr. Bill Lappenbusch, a toxicologist, as an expert in the public health assessment of risks posed by contaminated waste sites. His testimony spoke to the potential risks posed by materials and substances allegedly being received by the existing sanitary landfill, adjacent to the proposed expansion site. The impact of his testimony was diluted by the fact that his review and corresponding opinion were based on reports of substances and materials being received by several landfills other than the existing landfill at issue. His analysis included hazardous wastes which are not permitted by the DEQ to be disposed of into a solid waste landfill. Therefore, his opinion was based on false assumptions and must be discounted in part. He had no opinion regarding actual risks posed by the existing landfill or its expansion; only a theoretical opinion regarding the potential risks of landfills in general. He was unfamiliar with either the design or operation of BFI's existing site or expansion site.[7]
The record abounds with testimony to the effect that some neighbors within the nearby communities opposed the landfill. It is clear that the decision to rezone was prompted by aesthetic concerns of neighboring landowners rather than bearing any substantial relationship to the health, safety, and general welfare of the public. "A legislative body has greater discretion in zoning to protect the public safety than it does in pursuing less compelling purposes." Tiber Petroleum v. Parish of Jefferson, 391 So.2d 1178, 1180 (La.1980).
In summary, a review of the record clearly shows that the Palermo property was down-zoned to stop the completion of the proposed landfill based upon the opposition of neighbors. The Nelson property and surrounding properties were down-zoned for the same purpose, to stop the construction of a landfill on any property which adjoined the present landfill. Also, the Nelson property and surrounding properties, which were down-zoned, were reclassified in a reactionary move to justify the down-zoning of the Palermo tract and as such, this action of the Police Jury was an abuse of discretion.
The evidence clearly establishes that the Police Jury's actions in rezoning the disputed properties constituted an unreasonable exercise of police power which *328 amounted to an abuse of discretion without any substantial relation to the public health, safety, and general welfare of the public.
Based on the foregoing, we find no rational reason to rezone these properties and, as such, we declare Ordinance No. 2959 invalid. We direct the Police Jury to return the reclassified properties to the original zoning, I-2, retaining the permitted uses of the I-2 classification as they were prior to February 18, 1988.[8]
Costs are assessed against appellees, Planning Commission of Calcasieu Parish and Police Jury of Calcasieu Parish, in the amount of $1116.43 at the trial level and in the amount of $1976.00 at the appellate level.
REVERSED.
NOTES
[1] The Nelson plaintiffs include Raymond L. Nelson, Sr., Raymond L. Nelson, Jr., Patricia Nelson Brummet, and Edward W. Nelson.
[2] Our finding that the trial court erred on the above assignments of error pretermits discussion of appellants' remaining assignments of error dealing with issues of notice and preemption.
[3] In State v. Adjustment Board of City of Baton Rouge, 220 La. 708, 57 So.2d 409 (1952), the Supreme Court found that the zoning bore no relationship to the health, safety and general welfare of the public upon facts supporting the theory of equitable estoppel, although the Supreme Court did not literally use the term "equitable estoppel."
[4] "60. Kennedy v. Evanston, 348 Ill 426, 181 NE 312; Clifton Hills Realty Co. v. Cincinnati, 60 Ohio App 443, 12 Ohio Ops 418, 27 Ohio L Abs 321, 21 NE2d 993; State ex rel. Schroedel v. Pagels, 257 Wis 376, 43 NW2d 349. See also Dobbins v. Los Angeles, 195 US 223, 49 L Ed 169, 25 S Ct 18.

61. Board of County Comrs. v. Lutz (Fla App) 314 So 2d 815, concurring fully with opinion of lower court; Largo v. Imperial Homes Corp. (Fla App) 309 So 2d 571.
62. Largo v. Imperial Homes Corp. (Fla App) 309 So 2d 571, wherein the court further held that the application of the doctrine of estoppel was not precluded merely because the developer had not obtained a building permit or had made physical changes in the property or because members of the public protested.
63. Board of County Comrs. v. Lutz (Fla App) 314 So 2d 815, where it appeared that the landowners obtained the zoning change and thereafter $100,000 in reliance upon it.
64. State ex rel. Schroedel v. Pagels, 257 Wis 376, 43 NW2d 349."
[5] See also, West v. City of Lake Charles, 375 So.2d 206 (La.App. 3 Cir.1979), writ refused, 378 So.2d 435 (La.1979) (proponent of rezoning failed to prove existing classification of property was unreasonable); Hernandez v. City of Lafayette, 399 So.2d 1179 (La.App. 3 Cir.1981), writ denied, 401 So.2d 1192 (La.1981), appeal dismissed, 455 U.S. 901, 102 S.Ct. 1242, 71 L.Ed.2d 440 (1982) (Proponent of rezoning failed to meet the burden of proving that the existing classification of property was unreasonable, arbitrary, or a denial of due process); Decuir v. Town of Marksville, 426 So.2d 766 (La.App. 3 Cir.1983), writ denied, 430 So.2d 83 (La.1983) (issue was whether a rational reason existed for piece meal or spot zoning).
[6] No connexity is established by this study between the existing landfill and heavy metal pollution.
[7] It is noteworthy that neither Dr. Ehrhardt nor Lappenbusch ever appeared before the Zoning Commission or the Police Jury before the property was downgraded. These witnesses only testified at the trial of this matter, after the property had been downgraded.
[8] Insofar as this Court orders the Police Jury to allow appellants herein to retain their original zoning classification with its attendant uses, the effect as the implementation of I-2R zoning and any discussion therein is pretermitted.